**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **GUNSTON HALL REALTY, INC. and** | ) | **Case No. 13-11553 (RGM)** |
| **BEST INDUSTRIES, INC.** | ) | **Case No. 13-11554 (RGM)** |
| | ) | |
| Debtors. | ) | **Chapter 11** |
| _____ | ) | |

**WELLS FARGO BANK N.A.'S MOTION TO APPOINT**
**A CHAPTER 11 TRUSTEE IN THE CASES OF GUNSTON HALL REALTY, INC. AND**
**BEST INDUSTRIES, INC.  PURSUANT TO 11 U.S.C. § 1104(A)**

Wells Fargo Bank, N.A. ("Wells"), by counsel, hereby moves (the "Motion") this Court,

pursuant to 11 U.S.C. § 1104, for entry of an order substantially in the form docketed in

conjunction with this motion appointing a Chapter 11 trustee in the related cases of Gunston Hall

Realty, Inc., ("Gunston Hall") and Best Industries ("Best Industries") (each a "Debtor" and

collectively, the "Debtors"), and in support thereof, respectfully states as follows:

**JURISDICTION AND VENUE**

1.      On April 5, 2013 (the "Petition Date"), the Debtors filed voluntary petitions under

Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.  (as amended, the

"Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of Virginia

(the "Bankruptcy Court") initiating the above-captioned cases (the "Cases").

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are §§ 105 and 1104 of the

Bankruptcy Code.

1

## PRELIMINARY STATEMENT

6.      The sole principal and manager of the Debtors – Krishnan Suthanthiran – is the

antithesis of what the Bankruptcy Code requires of a fiduciary to serve as debtor in possession.

Mr. Suthanthiran (a/k/a "Krish") owns and controls the Debtors, as well as the several affiliated

and intertwined non-debtors.  The Debtors and Krish have engaged in a pattern of excessively

litigious, dishonest, and behavior that has been destructive of value especially with respect to

Wells and its collateral.  This behavior includes concealment of assets, fraudulent transfers, self-

dealing, commingling of assets, and other improper conduct described in more detail in this

Motion.  A debtor in possession is a fiduciary and the Bankruptcy Code and the Bankruptcy

Rules require candor, transparency, honesty, and some basic ability to manage business affairs to

serve in that capacity.  The Debtors and Krish have proven themselves unwilling and incapable

to do so and should not be allowed to serve as fiduciaries of these estates.  Indeed, when a

previously affiliated entity underwent insolvency proceedings in Belgium, the Court found that

Mr. Suthanthiran "drained the cash flow of the company" with inappropriate intercompany loans,

and obstructed a potential sale of assets.  The Belgian Court appointed the equivalent of a

Chapter 11 trustee, and the country opened a criminal investigation against him.  *See infra*, paras.

37-39.  Mr. Suthanthiran should not be given the opportunity to repeat such conduct in these

bankruptcy cases.  It is important emphasize that Wells on the on the other hand is not seeking to

deprive the Debtors the benefits of the Bankruptcy Code.  Wells simply wants assurance that its

collateral will be properly protected and its rights under the Loan Documents – which the

Debtors and Krish have breached with impunity – are honored.  In order to do so Wells submits

that these cases require an independent third-party arms-length fiduciary to protect the

bankruptcy estates, and to exercise independent management and judgment for the benefit of all

stakeholders.

## FACTUAL BACKGROUND

7.      Wells is a national banking association with its main office located in Sioux Falls,

South Dakota.  The Debtors are Virginia limited liability corporations, with their principal place

of business in Springfield, Virginia.  Krishnan Suthanthiran is an individual who currently

resides in Lorton, Virginia.

8.      The Debtors are part of a group of companies organized under the "Best Medical"

umbrella, with Best Medical International, Inc. ("BMI") serving as the main operating entity for

the group.  BMI and several of its affiliates produce and sell medical products and equipment.

The Debtors are Best Medical's primary real estate investment and holding entities, each owning

several pieces of developed and undeveloped properties in Maryland, Virginia and Tennessee.

9.      Mr. Suthanthiran is the President, sole shareholder, and Chairman of the Board of

each of the Debtors, as well as BMI and all other entities in the Best Medical group.  *See* Exhibit

A, Deposition Transcript, Krishnan Suthanthiran, *Best Medical Int'l, Inc., et al, v. Wells Fargo*

*Bank, N.A.*, Case Nos. 2010-10997, 9395, 9414, 13:10-22, 14:1 (May 25, 2012).

### The Indebtedness

10.     The Debtors' involvement with Wells stems from several loans and lines of credit

which the Debtors and certain of its affiliates obtained from Wells Fargo's predecessor

Wachovia Bank, N.A. ("Wachovia") between 2004 and 2006 (collectively the "Loan

Documents").  The Loan Documents include a Promissory Note between Gunston Hall and

Wachovia dated August 5, 2005 (the "Gunston Hall Note").  The Gunston Hall Note was secured

by two deeds of trust: (i) an August 5, 2005 Deed of Trust and Security Agreement which gave

Wachovia a lien on the property located at 7643 and 7643-B Fullerton Road, Springfield,

Virginia, 22153, which constitutes a portion of the Best Medical corporate headquarters, and

(ii) an August 7, 2008, Deed of Trust and Security Agreement which gave Wachovia a lien on

the property located at 7639 Fullerton Road, Springfield, Virginia, 22153, which is the other

portion of the Debtors' corporate headquarters (together with 7643 and 7643-B Fullerton Road,

Springfield, Virginia, 22153, the "Fullerton Properties").[1]  The Loan Documents also include a

Promissory Note between BMI and Wachovia dated October 29, 2004 (the "BMI Note"), which

was secured by the BMI Security Agreement and which gave Wachovia a lien on all personal

property of BMI.  The Gunston Hall Note and BMI Note are also secured by non-debtor property

owned by affiliates of the Debtors.

11.    Mr. Suthanthiran personally and unconditionally guaranteed all of the Best

Medical borrower entities' obligations under the Loan Documents.  Additionally, Best Industries

guaranteed the BMI Note.

12.    In 2009, the Best Medical borrowers defaulted on several Loan Documents,

including the Gunston Hall and BMI Notes.  On July 31, 2009, the Debtors, the additional Best

Medical borrowing entities, Mr. Suthanthiran, and Wachovia entered into a Waiver and

Amendment Agreement with respect to the Loan Documents, requiring that Wells be repaid by

January 1, 2010.  In addition, Mr. Suthanthiran, the Best Medical borrowers and certain other

Best Medical entities executed three Guaranty of Payment Agreements (together with the Waiver

and Amendment Agreement, the "Waiver Agreements"), personally and unconditionally

guaranteeing the Best Medical borrowers' obligations under the Loan Documents.  As of the date

---

[1]    As discussed below, the Fullerton Properties are owned by the Debtors of these cases and
leased to BMI.

of this Motion, the Debtors and other Best Medical borrowers have not repaid or refinanced the

loans, and they remain in default under the Waiver Agreements.

**Related Federal and State Court Actions**

13.    On June 20, 2010, Wells exercised its rights under the Waiver Agreements and

confessed judgment against the Debtors and Mr. Suthanthiran in connection with the unpaid

amounts due under the Loan Documents.  The Best Medical entities challenged the confessed

judgments, and after litigating numerous claims from five separate complaints from the Best

Medical entities, the Fairfax County Circuit Court (the "Fairfax Circuit Court") finally dismissed

the baseless claims and ruled that Wells was entitled to judgment.  On February 24, 2012, the

Fairfax Circuit Court entered judgment in Wells' favor against the Debtors and Mr. Suthanthiran

in the amount of $12,119,254.01, and an additional $800,086.78 against the Debtors, Mr.

Suthanthiran, BMI, and Huestis Machine Corporation for related attorney's fees (together, the

"Judgments").

14.    In response to the Judgments and Wells' collection actions, the Debtors and Mr.

Suthanthiran began a protracted legal battle, both in state and federal courts in both Virginia and

Maryland, contesting Wells' rights to recover the sums due and owing.  In addition to contesting

every collection action commenced by Wells, the Debtors and Mr. Suthanthiran initiated entirely

unfounded federal lawsuits against Wells and certain of its officers alleging racial discrimination

(Case No. 1:11-cv-1277), tortious interference and defamation (Case No.1:12-cv-875), and

fraud, breach of contract, and rescission based on the LIBOR manipulation scandal by Barclays

Bank (Case No. 1:12-cv-957).  Wells successfully obtained dismissal of each of these federal

suits initiated by the Debtors and Mr. Suthanthiran by the United States District Court for the

Eastern District of Virginia, two with prejudice for a complete lack of foundation.  At the state court level, the Fairfax Circuit Court has approved Wells' debtor's interrogatories (the "Debtor's Interrogatories"), garnishment actions, and has consistently overruled the various challenges that the Debtors and Mr. Suthanthiran have asserted.  In response to these numerous and groundless legal actions, Wells has been forced at great expense to repeatedly defend itself from these false accusations from the Debtors, Mr. Suthanthiran, and the other non-debtor obligors even though Wells was merely attempting to collect on the matured and unsatisfied Judgments.

15.     The Debtor's Interrogatories, which typically involve a relatively short discovery exercise, lasted nearly one year due to the variety of delay tactics and outright obstruction that the Debtors and Mr. Suthanthiran employed.  Mr. Suthanthiran, as President and ultimate authority for all Best Medical entities, first refused to appear for a deposition duly noticed and approved by the Fairfax Circuit Court in connection with the Debtor's Interrogatories.  On May 25, 2012, when Mr. Suthanthiran finally was compelled to appear for a deposition, he deliberately evaded Wells' questions by answering "I don't know" and otherwise either demonstrating or feigning a lack of any substantive knowledge with respect to nearly every aspect of the Best Medical entities, details that one in the role of President, sole shareholder, board member, and ultimate decision maker of several active businesses would surely know.  *See* Suthanthiran Depo. Tr. May 25, 2012.  Once counsel for Wells brought Mr. Suthanthiran's misconduct to the Fairfax Circuit Court's attention, the Court ordered Mr. Suthanthiran to appear for an additional deposition under the threat of incarceration if he again attempted to evade truthfully answering Wells' questions.  *See* Exhibit B, Hearing Transcript, *Best Medical Int'l, Inc., et al, v. Wells Fargo Bank, N.A.*, Case Nos. 2010-10997, 9395, 9414, 18:4-11 (Fairfax Circ. Ct. June 22, 2012) (J. Roush).

6

16.     While depositions pursuant to Wells' Debtor's Interrogatories continued, Wells filed garnishment summons against the Debtors, BMI, and several other Best Medical entities seeking to garnish at least $12 million from intercompany accounts that were owed to a judgment debtor according to the documents produced by the Best Medical entities.  Each garnishee, a Debtor or Best Medical affiliate (collectively, the "Garnishees"), filed its Answer to Wells' garnishment summons initially on May 24, 2012, stating that no funds were owed by the corresponding Judgment debtor, and accordingly that no funds were held for that particular Judgment debtor.  In a subsequent responsive pleading, the Garnishees actually asserted that since each of the Garnishees was a Best Medical entity owned and controlled by Mr. Suthanthiran personally, "Mr. Suthanthiran owns the company that owes him money, so in effect he owes it to himself." *See* Exhibit B, at 13:10-23.

17.     The Garnishees thereafter amended their Answers three separate times between May and September, 2012, with subsequent versions "inadvertently" inverting the relationship between Garnishee and Judgment debtor, and continuously changing the total amounts owed and held for each Garnishee.  *See* Exhibit C, Hearing Transcript, *Best Medical International, Inc., et al, v. Wells Fargo Bank, N.A.*, 10:9-14 (Fairfax Circ. Ct. November 9, 2012) (J. Roush). Whether due to pure incompetence or in an attempt to deliberately delay the garnishment process, the Debtors and various Best Medical affiliates forced Wells to expend a huge amount of additional time and cost to review and appropriately respond to the continuously changing Answers to Wells' garnishment summonses.  This convoluted process finally concluded before the Fairfax Circuit Court on November 9, 2012, when the Court ordered six orders for payment against five Best Medical entities as Garnishees, giving no credit whatsoever to the Garnishees and Judgment debtors' arguments that because they are wholly interrelated affiliates all owned

by Mr. Suthanthiran, that they did not actually have any obligations to pay each other the funds

due and owing. *Id.*, 15:15-16. These orders for payment were converted to judgments on

February 22, 2013, by the Fairfax Circuit Court after the Garnishees failed to satisfy the orders

for payment.

18.     In early 2013, Wells instituted foreclosure proceedings against the Debtors in

connection with the Fullerton Properties. The foreclosure sale of the Fullerton Properties was

scheduled for Tuesday, April 9, 2013. The Fullerton Properties are owned by the Debtors, but

leased to BMI pursuant to two intercompany leases (the "Fullerton Leases"). Copies of the

Leases are attached at Exhibit D. On April 5, 2013, the Debtors filed a motion for a preliminary

injunction in the United States District Court for the Eastern District of Virginia (the "District

Court") Case No. 1:13-cv-00378-GBL/TRJ, claiming that BMI's possession of a small quantity

of radioactive material for use in its medical device manufacturing business at the Fullerton

Properties should prevent the foreclosure from going forward. In response, Wells sought the

appointment of a receiver over the Fullerton Properties to enforce the intercompany lease

obligations, including but not limited to, the payment of rent, funding of decommissioning

escrows, and the proper handling of any radioactive material by the tenant BMI. Wells

particularly sought the enforcement of a key protective provision of the Fullerton Leases in

which BMI was to provide $900,000 in escrowed funds for the costs of decommissioning the

property with regard to radioactive materials. This provision had previously been unenforced

and no funds had been set aside. Wells' collateral is clearly at risk without funding of the

decommissioning escrow and its better off not to have BMI as a tenant—especially if they

cannot or will not pay rent as required—than to have them continue to occupy the premises. At

the hearing on Friday morning, April 5, 2013, the District Court denied the preliminary

injunction request and granted Wells' request to appoint a receiver over the Fullerton Properties. A copy of Judge Lee's order is attached hereto as Exhibit E. The Debtors filed their bankruptcy petitions later that afternoon to prevent the receiver from taking control of the Fullerton Properties.

## BASIS FOR RELIEF

19.     By this Motion, Wells requests that this Court appoint a Chapter 11 Trustee to oversee the Debtors' affairs, to ensure compliance with their duties as debtors-in-possession under the Bankruptcy Code, to protect the various real estate and other property of the estate, and to ensure against further deterioration in the value of the Wells collateral.

### I.      Fraud and Dishonesty by the Debtors and Mr. Suthanthiran

20.     Throughout the course of various disputes with Wells regarding its collection and judgment execution the Debtors and Mr. Suthanthiran have consistently obstructed, hindered, and delayed Wells' attempts to collect the Judgments and has engaged in hide-the-ball tactics inconsistent with transparency and disclosure incumbent upon a fiduciary in bankruptcy. Moreover, the Debtors recently escalated their abusive tactics by attempting to fraudulently transfer approximately $1.5 million belonging to Gunston Hall to a Canadian affiliate in an attempt to evade  Wells' discovering it as an asset to pay down its unsatisfied Judgments.

21.     On December 17, 2012, before Commissioner Brien Roche, Esq. ("Commissioner Roche") Wells deposed Mr. Weingast pursuant to the Debtor's Interrogatories.[2] Mr. Weingast deliberately delayed the deposition which should have occurred several weeks earlier because of

---

[2]      Shawn R. Weingast is the General Manager of Gunston Hall, General Manager and Managing Director of Best Industries, and General Counsel for Best Medical's medical companies. See Exhibit A, Deposition Transcript, Shawn R. Weingast, Dec. 17, 2012, p. 12. James M. Brady serves as additional in-house counsel for all Best Medical entities. Id. at 1.

an alleged scheduling conflict.   When the deposition finally occurred, Mr. Weingast testified

that Gunston Hall owns a 50% interest in several Maryland limited liability companies (the

"Maryland LLC's"), one of which is Joyce Lane Properties, LLC ("Joyce Lane").[3]  Exhibit F,

Deposition Transcript, Shawn R. Weingast, *Best Medical Int'l, Inc., et al, v. Wells Fargo Bank,*

*N.A.*, Case Nos. 2010-10997, 9395, 9414, 11:14-22, 12:1-14 (Dec. 17, 2012).  Joyce Lane is a

single-purpose LLC that only owns a single piece of real property located in Anne Arundel

County, Maryland.  *Id.*, 36:7-8.

22.      Prior to Mr. Weingast's deposition, at the Commissioner's direction, Wells

requested any documents in the Debtors' possession regarding any sales or transfers of any of the

Debtors' real estate holdings.  *Id.*, 15-19.  However, for the first time upon questioning by Wells'

counsel, Mr. Weingast suggested that Gunston Hall purportedly entered into an assignment

agreement with its Canadian affiliate, Best Theratronics, Ltd. ("Best Theratronics") for the rights

to the proceeds of the sale of the Joyce Lane property in connection with Gunston Hall's 50%

interest in Joyce Lane, on or around November 29, 2012, in exchange for an alleged prior

advance of funds made by Best Theratronics to Gunston Hall or BMI.  *Id.*, 28:14-22, 29:1-14.

The purported Assignment of Proceeds From Sale of Real Estate Agreement between Gunston

Hall and Best Theratronics, Ltd. (the "Gunston Hall - Best Theratronics Assignment") is attached

hereto as Exhibit G.  Mr. Weingast estimated that Gunston Hall's right to the proceeds of the

Joyce Lane sale was between $1.5 and $1.6 million.  Exhibit F, Weingast Depo. Tr., 30:6.  It was

further established that Mr. Brady and Mr. Weingast failed to produce the alleged Gunston Hall

– Best Theratronics Assignment, in violation of the Wells' document requests as ordered by the

Commissioner.  *Id.*, 15-19.

---

[3]      Mr. Weingast stated that the parcel of real property which Joyce Lane LLC relates is also
known as "Admiral's Ridge."

23.     Mr. Weingast, the General Manager of Gunston Hall in charge of all of Best

Medical's real estate holdings, claimed to have no involvement with the alleged Gunston Hall –

Best Theratronics Assignment, and indicated that only Mr. Suthanthiran and Mr. Brady had full

knowledge of the alleged Gunston Hall – Best Theratronics Assignment.  *Id.*, 32-33.

24.     The purported Gunston Hall – Best Theratronics Assignment was a blatant

attempt by Gunston Hall, a debtor under the Judgments, to fraudulently transfer its assets in

order to avoid execution by Wells, the judgment creditor.

25.     Commissioner Roche immediately expressed concern regarding the fraudulent

nature of the Gunston Hall – Best Theratronics Assignment as well as the Debtors' concealment

of the underlying documentation from Wells.  Immediately upon hearing of the assignment, the

court-appointed Commissioner asked Mr. Brady:  "And why would a judgment debtor be

assigning proceeds when you know that you got a judgment creditor who's after you?  I mean,

why would that not be fraudulent?"  Exhibit F, Weingast Depo. Tr., 21:1-4.

26.     At the conclusion of Mr. Weingast's deposition Commissioner Roche ordered the

funds subject to the Gunston Hall – Best Theratronics Assignment not to be transferred without

Wells first being able to bring the issue to the Fairfax Circuit Court's attention,[4] and expressed

strong disapproval for the Gunston Hall – Best Theratronics Assignment and the Debtors'

counsel's evident attempt to conceal the transaction: "And I'll just state on the record: I'm very

concerned about this assignment of proceeds.  **On its face, it appears to me to be fraudulent,**

**and it appears that [the Debtors' in-house] counsel was involved in the preparation of those**

**documents**."  *Id.*, 162:18-22 (emphasis added).

---

[4]     Later in the day on December 17, 2012, counsel for Wells reached an agreement with
counsel to the 50% managing partner of Joyce Lane to hold the funds in their possession
until further notice.

## II.   <u>Mismanagement by Mr. Suthanthiran</u>

27.     Over the course of several years, Mr. Suthanthiran, in his capacity as President, has grossly mismanaged the Debtors' estates and is incapable of performing the fiduciary duties required of debtors-in-possession.  He has proven to be dishonest and has perpetuated a long pattern of fraudulent and misleading conduct by the Debtors and various Best Medical affiliates.

28.     The various forms of financial documentation that the Debtors produced to Wells during the course of the Debtors Interrogatories, and the explanations received at depositions in connection with that documentation, clearly show that the Debtors and each Best Medical affiliate routinely abuse corporate formalities, commingle funds, and generally operate as one collective enterprise run for the sole personal benefit of Mr. Suthanthiran.  At best the enterprise is hopelessly disorganized with no adequate financial accounting protocols or procedures, and at worst is run solely by Mr. Suthanthiran to the detriment of the Debtor.  Whichever the case may be, the Debtors' enterprise is in desperate need of independent and disinterested third-party oversight and control that only a Chapter 11 trustee and fiduciary can provide.

Mr. Suthanthiran abuses the Debtors' corporate formalities by freely transferring funds to himself from his Best Medical companies, as much as he wants and whenever he wants, and treats these companies as his personal "piggy bank".  Mr. Suthanthiran receives no actual salary payments in his capacity as President and CEO of the Debtors and all other Best Medical entities.  *See* <u>Exhibit A</u>, Krishnan Suthanthiran Depo. Tr., May 25, 2012, 50:3-12; <u>Exhibit H</u>, Deposition Transcript, Marion Speranzo, *Best Medical Int'l, Inc., et al, v. Wells Fargo Bank, N.A.*, Case Nos. 2010-10997, 9395, 9414, 22:4-5 (Nov. 14, 2012).  Mr. Suthanthiran maintains

no personal bank accounts, and instead all of his personal expenses are paid from Best Medical

bank accounts.  *See* Exhibit A, Suthanthiran Depo. Tr. at 20; Exhibit H, Speranzo Depo Tr. at 22;

Exhibit I, Deposition Transcript, Jessica Peverall, *Best Medical Int'l, Inc., et al, v. Wells Fargo*

*Bank, N.A.*, Case Nos. 2010-10997, 9395, 9414, 63:16-17 (Aug. 31, 2012).

29.      In addition to living completely off of the Best Medical entities, Mr. Suthanthiran

is also the ultimate decision maker with respect to the Debtors and all other Best Medical

entities. Depositions taken of Mr. Suthanthiran himself as well as the members of the Debtors'

accounting team affirm that Mr. Suthanthiran retains ultimate and plenary decision-making

authority for all Best Medical entities, particularly with respect to any decisions to transfer its

real estate assets.  *See* Exhibit A, Suthanthiran Depo. Tr. at 30:14-21; Exhibit I, Peverall Depo.

Tr. at 8:18-19; Exhibit H, Speranzo Depo. Tr. at 7:9-13.  Notably, despite being repeatedly

affirmed as the ultimate decision maker for the Debtors and all other Best Medical affiliates, Mr.

Suthanthiran denied knowledge of nearly all substantive company matters in his first deposition

taken by Wells on May 25, 2012, such as who the officers are, who the board members are, and

whether any board meetings are conducted.   As previously discussed, due to the Debtors' and

Mr. Suthanthiran's deliberate obstruction of Wells' collection discovery, Mr. Suthanthiran was

eventually ordered to appear personally at Court-supervised Debtors' Interrogatories under threat

of incarceration if he was unwilling or unable to answer questions completely and truthfully

under oath.  *See* Exhibit A, Hr'g Tr. 18:8-11 (June 22, 2012).  This process took many months

and at substantial cost to Wells.  In fact, the Debtors were so incompetent or deceitful with

respect to intercompany obligations that they required multiple months and multiple answers to

fully respond to garnishment requests.  Wells ultimately obtained another judgment in its favor

as a result of such intercompany debts after the Court overruled the Mr. Suthanthiran's objection

and argument that since he owned all the companies he was free to decide what debts to pay and

what debts not to pay.

30.     For the Best Medical entities which have a board of directors, Mr. Suthanthiran is

the Chairman of the Board and sole shareholder.  *See* <u>Exhibit A</u>, Suthanthiran Depo. Tr. at 28:15-

29:8.  The many Best Medical entities operating under Mr. Suthanthiran's control function as a

single business.  The regular practice of the Debtors and all other Best Medical entities is to draw

from multiple Best Medical bank accounts in order to pay the bills and other obligations of any

Best Medical affiliate on an as needed basis regardless of which entity owes the debt.  *See*

<u>Exhibit I</u>, Peverall Depo. Tr., 78-80.  In particular, for a period of approximately four months in

2012, apparently after Wells successfully garnished several BMI bank accounts, BMI elected to

route all incoming BMI funds to one of its non-operating affiliates based in Pennsylvania, Best

Fayette Medical Center, LP, and temporarily paid all of BMI's operating expenses from its bank

account, before later switching to different bank accounts.  <u>Exhibit I</u>, Peverall Depo. 78-80.

Ms. Peverall and an outside accountant, Mr. Rick Belle Isle, also affirmed that the Debtors and

all Best Medical affiliates frequently make intercompany transfers of funds whenever any Best

Medical entity needs money without any underlying loan or transfer documentation.  *See*

<u>Exhibit I</u>, Peverall Depo. Tr., 20-21; <u>Exhibit J</u>, Richard Belle Isle, *Best Medical Int'l, Inc., et al,*

*v. Wells Fargo Bank, N.A.*, Case Nos. 2010-10997, 9395, 9414, 42-43 (July 13, 2012).  Mr.

Suthanthiran promulgated this practice, documented only by internal general ledger book entry

transfers of funds between Mr. Suthanthiran and various Best Medical entities.  *See* <u>Exhibit H</u>,

Speranzo Depo. Tr., 31; <u>Exhibit J</u>, Belle Isle Depo Tr. at 41.

31.     The Debtors' own financial consultant hired to assist in seeking alternate sources

of financing admitted that the Best Medical entities' lack of transparency with respect to its

corporate structure was a problematic issue.  *See* Exhibit K, Memorandum Opinion and Order,

*Best Medical International, Inc., et al, v. Wells Fargo Bank, N.A.*, Case No. 11-cv-1277, 17

(GBL/TRJ) (E.D. Va. Mar. 29, 2013) (J. Lee) (E.D.Va. Mar. 29, 2013) (U.S. district court

opinion granting Wells summary judgment on racial discrimination claims, *citing* Exhibit L,

Deposition Transcript, Robert Martins, *Best Medical International, Inc., et al, v. Wells Fargo*

*Bank, N.A.*, Case No. 11-cv-01277, 20:15-19 (Oct. 17, 2012)).  United Bank denied the Debtors'

application for financing for several stated reasons including the lack of integrating accounting

controls, the lack of satisfactory consolidated financial statements, and the lack of cash flow

information for the Debtors and all Best Medical entities, Mr. Suthanthiran, and his related real

estate interests.  *See* Exhibit M, United Bank Letter Re: Krishnan Suthanthiran/Best Industries

Loan Request, August 27, 2012.

32.     As a result of Mr. Suthanthiran's total lack of normal corporate management and

accounting protocols, the Debtors have not been able to secure alternate financing to fund its

operations, and its overall financial health has seriously diminished over the last year.  *See*

Exhibit H, Speranzo Depo. Tr. 17:22-23.

33.     The Fullerton Properties, which serve as the corporate headquarters for BMI, Best

Industries, and several other Best Medical entities, are leased from Gunston Hall and Best

Industries.  *See* Exhibit D, Fullerton Leases.  Under the Fullerton Leases, BMI is obligated to pay

monthly rent to Best Industries in the amounts of $12,783.50 with annual increases of the greater

of 3% of the previous year's rent or by the Consumer Price index.  BMI is also obligated to pay

monthly rent to Gunston Hall in the amount of $23,153.00 Gunston Hall with similar increases

of the greater of 3% of the previous year's rent or by the Consumer Price index.

34.     However, the monthly rent payments due from BMI to Gunston Hall, like all other intercompany obligations in the Best Medical family, are made via multiple intercompany book entries without any actual payments being made or otherwise documented.  *See* <u>Exhibit I</u>, Peverall Depo. Tr. 20:19-22, 21:1-9 (discussing why it is unclear from company ledgers if or how the BMI rent to Gunston Hall is paid).  Ms. Peverall explained the intercompany ledger transfers as follows:  "[B]ecause they're affiliates, there is money going back and forth between them as needed or due to other loans or something along those lines.  So this number here [reporting the total owed from Gunston Hall and BMI] is not just one number on a financial statement, that was only one transaction.  It's made up of a bunch of things.  It's a net of the pluses and minuses."  *Id.*, 19-22, 21:1-9.  In addition, on November 14, 2012, Ms. Speranzo testified that in 2012, BMI simply stopped paying rent to the Debtors.  She indicated that this decision by management to stop making intercompany book transfers of approximately $30,000 to $40,000 for monthly rent on the Fullerton Properties was due to Wells' collection efforts against the Debtors pursuant to the Judgments.  *See* <u>Exhibit H</u>, Speranzo Depo. Tr. 16:1-3, 17:1-16.

35.     Publicly available tax records show that as of April 9, 2013, Gunston Hall has failed to timely pay $123,688.86 in real estate taxes for an undeveloped parcel of land it owns in Prince George's County, Maryland.  Under applicable county rules, if the delinquent taxes are not paid by early May 2013, the property would be sold at a tax sale shortly thereafter.  Additionally, four of the single-purpose Maryland LLC's in which Gunston Hall has a 50% ownership interest are delinquent in real estate tax payments in excess of $90,000 for the four underlying properties in Prince George's County and Anne Arundel County, Maryland.  Under

the applicable county rules, tax sales on these properties would be held in May and June 2013 if

the delinquent real estate taxes are not paid by May 2013.

36.     Against this backdrop of gross mismanagement, over the Debtors' vigorous

opposition, the U.S. District Court for the Eastern District of Virginia in Case No. 1:13-cv-00378

appointed a receiver for the Fullerton properties only an hour before the Debtors filed their

bankruptcy petitions.  *See* Exhibit E.  The Debtors had sought to enjoin Wells from conducting

the foreclosure sale by arguing that BMI, the tenant of the Fullerton Properties, had a license for

the possession of radioactive materials at the facility, which if foreclosed, might end up in the

hands of terrorists.[5]  Wells responded by seeking the appointment of a receiver under Virginia

law due to (a) the Best Medical parties' apparent abdication of their affirmative duties to handle

the radioactive materials properly and (b) the Best Medical parties' complete failure to maintain

a escrowed fund totaling $900,000.00 which the entities were required to have under their own

leases for decommissioning costs related to the radioactive materials.  The District Court agreed

with Wells' position, recognized the strong and immediate need for a receiver for the Fullerton

Properties, and appointed Michael L. Schuett as receiver that same day.

37.     As detailed above, this is hardly the first time that Mr. Suthanthiran has attempted

to abuse applicable local legal processes in an attempt to stave off Wells' collection efforts and

prop up its failing businesses.  In October 2011, a Best Medical affiliate based in Belgium, Best

Medical Belgium, S.A. ("Best Medical Belgium"), filed for the Belgian equivalent of Chapter 11

protection in the Commercial Court of Charleroi (the "Belgium Court").  Mr. Suthanthiran was

the principal and President of Best Medical Belgium.

---

[5]     The Best Medical entities had made the exact same argument to the Fairfax Circuit Court
only two years prior following a foreclosure by an unrelated third party, and were
completely unsuccessful in their efforts.

38.    After finding that Best Medical Belgium had committed "serious breaches

threatening its continuity," the Belgium Court saw fit to appoint the equivalent of a Chapter 11

trustee to replace Best Medical Belgium's management.  In early 2012 it was determined that the

equivalent of a Chapter 11 plan was not feasible in Best Medical Belgium's case, and the

Belgium Court ordered the liquidation of its assets and appointed a judicial trustee to oversee the

sale.  While the sale was pending, Best Medical Belgium initiated claims for breach of contract,

fraud, taking of property, racial discrimination (again), and conspiracy against the Kingdom of

Belgium, a Belgian trade development agency, a Belgian judge appointed to oversee Best

Medical Belgium's restructuring, and two officers of the Court who served in a joint role

equivalent to that of a Chapter 11 trustee.  At a hearing held on May 7, 2012, the Belgium Court

found that, during the time period in which Best Medical Belgium's asset sale should have

occurred with the oversight of the court-appointed judicial trustee, Best Medical Belgium, its

employees, creditors, and directors had "adopted several suspicious decisions which, as a

consequence, drained the cash flow of the company."  *See* Exhibit N, Commercial Court of

Charleroi, Case no. B/12/00141 and B/12/00142, Directory no. 4026-4027, May 8, 2012 (Belg.)

(the "Belgium Court Judgment").  Specifically, the Belgium Court held that Best Medical

Belgium had made inappropriate and vague loans and orders in excess of 15,000,000 EUR to

related companies in the United States and Canada, completely draining the funds intended for

the recovery of the company.  *Id.* at 4.  The Belgium Court further held that Mr. Suthanthiran

personally obstructed and frustrated the successful sale of Best Medical Belgium's assets,

including asserting that Best Medical Belgium did not own its intellectual property, as well as

posting a copy of its aforementioned complaint on its website in order to dissuade potential

purchasers and encouraging others to add conditions making it impossible to finalize a

satisfactory transfer within a reasonable timeframe.  *Id.*  The Belgium Court noted that criminal

investigations were opened against Mr. Suthanthiran personally for his actions.  *Id.*

39.     Soon afterwards, Mr. Suthanthiran testified briefly regarding the state of the Best

Medical Belgium proceedings, and painted a different picture to Wells' counsel, stating simply

that the Best Medical Belgium court-appointed administrators had "rejected every one of [his]

plans" to make the company viable and instead chose to liquidate the company.  Exhibit A,

Suthanthiran Depo Tr. 33:17-22, 34:3.  He affirmed that Best Medical Belgium had indeed

transferred approximately 3,000,000 to 4,000,000 EUR to Best Theratronics, Inc., the American

holding company for Best Theratronics, Ltd., Best Medical's Canadian affiliate.  *Id.*, 34:17-21.

## ARGUMENT

### Appointment of a Chapter 11 Trustee Is Proper Under 11 U.S.C. § 1104(a).

40.     Based on the foregoing, Mr. Suthanthiran's continued management of the Debtors

will further jeopardize the interests of the bankruptcy estate, the creditors (to the extent any other

creditors exist), and parties in interest.  The evidence also shows that Mr. Suthanthiran is unable

to comply with his fiduciary duties under the Bankruptcy Code as a debtor in possession.  To

ensure that the Debtors' estates are not seriously and irreparably harmed by Mr. Suthanthiran

during these Cases, and in an effort to maximize the value of the estate for the benefit of its

creditors, Wells requests that a Chapter 11 trustee be appointed to take over the Debtor's

financial and managerial duties under the Bankruptcy Code.

41.     The appointment of a trustee is governed by 11 U.S.C. § 1104(a), which states:

(a) At any time after the commencement of the case but before confirmation of a
plan, on request of a party in interest or the United States trustee, and after notice
and a hearing, the court shall order the appointment of a trustee--
    (1) for cause, including fraud, dishonesty, incompetence, or gross
    mismanagement of the affairs of the debtor by current management, either
    before or after the commencement of the case, or similar cause, but not

including the number of holders of securities of the debtor or the amount
of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity
security holders, and other interests of the estate, without regard to the
number of holders of securities of the debtor or the amount of assets or
liabilities of the debtor.

42.     A trustee may be appointed under either subsection of § 1104.  The appointment

of a trustee under subsection (a)(1) of § 1104 is in fact mandatory where cause is found to exist.

In contrast, subsection (a)(2) requires a "balancing of the interests against costs" and is

discretionary.  *In re IPofA West Oaks Mall, LP*, 2007 Bankr. LEXIS 3737 at *10-13 (Bankr. E.D.

Va. Oct. 29, 2007).  Appointment of a trustee in these cases is appropriate under either

subsection, and is in fact required under § 1104(a)(1) because cause does exist.  The Court may

also appoint a trustee under § 1104(a)(2) because such action is in the best interests of the

creditors, equity security holders, and other interests of the estate.

**(A)     Cause exists for the mandatory appointment of a trustee under 11 U.S.C.
§ 1517(a)(1).**

43.     These cases present facts which compel the appointment of a trustee under

§ 1104(a)(1).  The provision uses the imperative "shall" upon a finding of cause, thus requiring a

court to appoint a trustee if cause is established.  *See In re Funge Systems, Inc.*, 2002 Bankr.

LEXIS 1937 at *13 (Bankr. E.D. Va. Oct. 17, 2002); *In re Oklahoma Refining Co.*, 838 F.2d

1133, 1136 (10th Cir. 1988) ("Once the court has found that cause exists under § 1104, it has no

discretion but must appoint a trustee.").

44.     Section 1104(a)(1) lists four non-exclusive bases upon which cause may be

established, including "fraud, dishonesty, incompetence, or gross mismanagement."  This list

only provides a starting point in determining whether cause exists to appoint a trustee.  *See West*

*Oaks Mall*, 2007 Bankr. LEXIS 3737 at *9-10; 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][c][i]

(15th ed. 2005); *In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D. Penn. 1988).  The

trier-of-fact has considerable discretion in determining whether such cause exists.  *See In re*

*Funge Systems, Inc.*, 2002 Bankr. LEXIS 1937 at *13-14.

45.    The appointment of a trustee must be determined on the prior actions of the

debtor's management, and not on any proposals for reorganization which the debtor may make.

*In re La Sherene*, 3 B.R. 169, 175 (Bankr. N.D. Ga. 1980) ("Future plans . . . will not condone

past management frauds, dishonesty, gross mismanagement, or incompetence . . . .").  The

evidence should be proved by clear and convincing evidence.  *Funge*, 2002 Bankr. LEXIS 1937

at *15.

### (i)    Cause exists under § 1104(a)(1) because of the Debtors' attempt to fraudulently transfer $1.5 million.

46.    Fraudulent actions by a bankruptcy debtor are clear grounds for the appointment

of a trustee.  In the case of *In re Intercat*, 247 B.R. 911, 922 (Bankr. S.D. Ga. 2000), a

bankruptcy court held that the appointment of a trustee was mandatory based upon numerous

acts of dishonesty and mismanagement, including (1) the floating of personal loans, which were

later treated as salary, to the founder and CEO; (2) the charging of thousands of dollars of

personal travel expenses to the corporation; and (3) the diversion of patent royalties from the

corporation to the founder and CEO.  *See also In re Main Line Motors*, 9 B.R. 782 (Bankr. E.D.

Pa. 1981) (holding that the appointment of a trustee was required where the president and sole

shareholder of debtor corporation transferred more than $300,000 out of the debtor corporation,

without interest, security, or a written instrument recording the debt).  The bankruptcy court in

*La Sherene*, 3 B.R. at 175-76, determined that a debtor's dishonest business practices, "if not

constituting fraud, were deceptive and in wanton and reckless disregard of the financial reality of

the business and its creditors."  That court appointed a trustee on the basis that "[o]nly an

independent and business-wise trustee can supply the leadership and credibility needed by this

enterprise to salvage its possibilities." *Id.* at 176.

47.     In this case, the attempt by the Debtors' management to fraudulently transfer

approximately $1.5 million belonging to Gunston Hall to a Canadian affiliate is more than

sufficient to constitute cause under § 1104(a)(1).  According to Mr. Weingast, one of the

Maryland LLC's in which Gunston Hall has in interest, Joyce Lane, sold valuable real estate.

Gunston Hall had the right to receive between $1.5 and $1.6 million in proceeds from that sale.

Although these proceeds were covered by a judgment lien in favor of Wells, Gunston Hall

nevertheless attempted to assign the full amount of these proceeds in order to avoid judgment

execution by Wells.  See Exhibit G.  Mr. Weingast and Mr. Brady thereafter deliberately failed

to produce the documentation of this fraudulent transfer.  Weingast Depo. Tr., 15-19.  The court-

appointed Commissioner who oversaw Wells' Debtor Interrogatories was rightly distressed by

this obvious fraudulent transfer:  "I'm very concerned about this assignment of proceeds.  On its

face, it appears to me to be fraudulent, and it appears that [the Debtors' in-house] counsel was

involved in the preparation of those documents."  Exhibit F, Weingast Depo. Tr. at 162.

48.     This attempt by the Debtors' management to fraudulent transfer approximately

$1.5 million requires the appointment of a trustee under § 1104(a)(1).  Although the Debtors,

along with all of the Best Medical entities, routinely shift money between Mr. Suthanthiran's

businesses in what amounts to a massive shell game, this particular transfer also violated basic

state law prohibitions against fraudulent transfers.  This dishonest behavior is emblematic of the

general approach of the Debtors' management, which is to evade their legal obligations and take

whatever means necessary regardless of the legal consequences to protect Mr. Suthanthiran's

conglomeration of businesses.[6]  Consequently, appointment of a Chapter 11 trustee under

§ 1104(a)(1) is necessary to ensure that the debtor in possession powers under the Bankruptcy

Code are not similarly abused and that the Debtors' obligations are met

      49.    Certain actions taken by Mr. Suthanthiran with respect to Best Medical Belgium

also qualify as fraud for the appointment of trustee under § 1104(a)(1).  According to the

Belgium Court, Mr. Suthanthiran's company made inappropriate and vague loans of more than

15,000,000 EUR to related companies in the United States and Canada."  Exhibit N, Belgium

Court Judgment, May 8, 2012 at 4.  Mr. Suthanthiran personally interfered with the sale of Best

Medical Belgium's assets.  *Id.*  Finally, criminal investigations were opened against Mr.

Suthanthiran personally.  The Belgium Court appreciated the need for supervision of Best

Medical Belgium in light of these factors, just as the District Court did in appointing a receiver

for the Fullerton Properties.  In the same vein, a chapter 11 trustee is necessary here under §

1104(a)(1) because of the fraudulent activities of Mr. Suthanthiran.

     **(ii)**    **Cause also exists under § 1104(a)(1) due to the gross mismanagement of the**
              **Debtors.**

      50.    Gross mismanagement also compels the appointment of a trustee.  Gross

mismanagement can encompass a wide-ranging scope of improper business practices.  *See In re*

*State Capital Corp.*, 51 B.R. 400 (Bankr. M.D. Fla. 1985) (appointing trustee because (1) there

were multiple unexplained transactions, (2) money was commingled, (3) adequate books and

records were not maintained, and (4) formal internal accounting controls and responsible

management practices were not instituted).  Another bankruptcy court observed that a trustee is

---

[6]    The Debtors' management also evaded Wells' collection effort when it re-routed all
incoming funds for BMI to another entity's bank account following garnishment of
BMI's primary accounts.  *See* Peverall Depo. Tr. at 78-80.  BMI continued to fund its
operations from that other entity's bank account for a period of about four months before
switching bank accounts again.  *Id.*

appropriate where a "debtor fails to maintain complete and accurate financial records, or fails to

substantiate undocumented transactions, so that there appears to be a confusion in the debtor's

accounting system." *In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987).

The court there noted that a trustee is especially necessary "where there are questionable inter-

company financial transfers and the principals of the debtor occupy conflicting positions in the

transferee companies." *Id.* The commingling of funds and indiscriminate pooling of assets

between a debtor and non-debtor demonstrates a strong need for a trustee so as to properly

observe corporate form and organize the entities' finances.

51.     The failure of a bankruptcy debtor to collect rent or demand repayment from a

related entity is a particularly egregious example of gross mismanagement. The *McCorhill* court

criticized the fact that other business entities in which the debtor's principals had interests were

not paying rent to the debtor. *Id.* In addition, the debtor had in fact paid more than $250,000 for

those related entities' expenses and obligations which the debtor was not seeking to collect. *Id.*

In the case of *Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land

P'ship)*, 455 B.R. 153 (B.A.P. 8th Cir. 2011), two partners were using partnership property for

themselves or other entities they owned without paying rent. The Eight Circuit B.A.P. concluded

that this self-dealing, among other reasons, warranted the appointment of a trustee under

§ 1104(a)(1).

52.     The failure to pay taxes is also a clear sign of gross mismanagement. The

bankruptcy court in *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426-27 (Bankr.

S.D.N.Y. 2007) appointed a trustee in large part because of the debtor's failure to pay taxes. The

court was especially concerned with this form of gross mismanagement where it leads to liability

for interest and penalties. *Id.* at 426.

24

53.     Gross mismanagement plagues all of Mr. Suthanthiran's businesses, and the Debtors are no exception.  The documents produced by the Debtors in the course of the Debtor's Interrogatories display a complete disregard for corporate formalities and corporate identity.  An employee of Mr. Suthanthiran testified that the Best Medical entities, including the Debtors, routinely draw from multiple Best Medical bank accounts as necessary to meet regular obligations.  *See* <u>Exhibit I</u>, Peverall Depo. Tr., 78-80.  This commingling of funds merges the finances of these related affiliates together, and they generally operate as one collective enterprise.  The fact that two of the Best Medical entities have now filed for bankruptcy—solely to avoid and evade the effect of Judge Lee's order appointing Mr. Schuett as receiver for the Fullerton Properties—mandates that Mr. Suthanthiran and the Debtors' management be removed from power over the Debtors' finances and that an objective independent third party fiduciary be installed.  Their incompetence (if not their intention) in permitting these companies' finances to become so ensnarled is itself cause enough for the appointment of a trustee.

54.     Commonplace accounting methods are not followed by the Debtors' management, and the books and records of all the Best Medical entities are in shambles.  The Best Medical entities do not currently have a CFO and have never had one.  The sheer difficulty that the Debtors' management had in determining the amounts and corporate identities of the intercompany transfers is clear evidence of this disorganization.  The months-long delay of the state court debtor interrogatory process caused by the slow assembly of the documentation and the constant amendments was improper behavior towards both the state court and Wells as a judgment creditor.  The Debtors' evident confusion and uncertainty about their own internal financial records, however, indicates the gross mismanagement that is the norm for all of the Best Medical entities.  The most striking element of this gross mismanagement was Mr.

Suthanthiran's sincere belief that since he owned all the companies he was free to decide what

debts to pay and what debts not to pay.  With two of these companies now in bankruptcy and the

concomitant fiduciary duties those Debtors now have, this deep misunderstanding of debt and

corporate separateness demands the appointment of a Chapter 11 trustee.

55.     This endemic disorganization is harming the Debtors and risking Wells' collateral

as well as the rights of any other creditors.  A financial consultant hired by the Debtors admitted

that the Best Medical entities' disregard of corporate form was problematic.  *See* Exhibit K,

Memorandum Opinion and Order, *Best Medical International, Inc., et al, v. Wells Fargo Bank,*

*N.A.*, Case No. 11-cv-1277 at 17 (*citing* Exhibit L, Martins Depo. Tr. 20:15-19).  This

disorganized state of financial affairs has recently prevented the Debtors from attaining financing

from other banks.[7]  The Debtors, along with the remainder of Mr. Suthanthiran's businesses, are

unable to secure financing to fund its operations due to its tremendous organizational issues, and

the financial health of the Debtors is threatened as a result.  *See* Exhibit H, Speranzo Depo. Tr. at

17:22-23.

56.     Mr. Suthanthiran relies exclusively the Best Medical entities' resources, including

that of the Debtors, for his personal living needs and expenses.  He purports to receive no salary,

maintains no personal bank account, and all of his credit card bills (to the extent personal and not

---

[7]      United Bank, one of the Debtors' recent potential sources of financing, denied the
Debtors' application for several stated reasons including: the lack of integrating
accounting controls and the lack of satisfactory consolidated financial statements and
cash flow information for the Debtors and all Best Medical entities, Mr. Suthanthiran,
and his related real estate interests.  *See* Exhibit M, United Bank Letter re: Krishnan
Suthanthiran/Best Industries Loan Request, Aug. 27, 2012.  The Debtors' own financial
consultant confirmed that these issues, particularly the lack of transparency with respect
to the Debtors' corporate structure, have prevented the Best Medical entities from being
able to secure financing.  *See* Exhibit K,  Memo Op. *Best Medical Int'l, Inc., et al, v.*
*Wells Fargo Bank, N.A.*, Case No. 11-cv-1277 (E.D.Va. Mar. 29, 2013) (U.S. district
court opinion granting Wells summary judgment on racial discrimination claims, *citing*
Exhibit L, Martins Depo. Tr., 20:15-19)).

in a companies' name) and all other personal expenses are paid from Best Medical bank

accounts.  *See* <u>Exhibit A</u>,  Suthanthiran Depo. Tr., 20; <u>Exhibit H</u>, Speranzo Depo Tr., 22; <u>Exhibit</u>

<u>I</u>, Peverall Depo. Tr., 63.  Combined with the fact that Mr. Suthanthiran retains all final decision-

making authority for all Best Medical entities, it is clear that these companies are mere alter egos

for Mr. Suthanthiran.  *See* <u>Exhibit A</u>, Suthanthiran Depo. Tr. at 30:14-21; <u>Exhibit I</u>, Peverall

Depo Tr. at 8:18-19; <u>Exhibit H</u>, Speranzo Depo. Tr. at 7:9-13.  Further, in the context of Wells'

garnishment efforts, the Fairfax Circuit Court overruled the Best Medical entities' arguments that

because Krish is the common owner and controller of each Best Medical entity, that they had no

obligations to pay one another the intercompany amounts due.  *See* <u>Exhibit C</u>, Hr'g Tr., *Best*

*Medical International, Inc., et al, v. Wells Fargo*, 15:15-16 (Nov. 9, 2012).  Mr. Suthanthiran

simply treats all of the Best Medical entities, including the Debtors, as alter egos over which he

maintains absolute control and discretion while simultaneously enjoying full access to their

resources.

  57. The Debtors have failed to properly collect rent or enforce other important lease

provisions on the Fullerton Properties from their affiliated company BMI.  The Fullerton

Properties serve as the headquarters for BMI, which is the main operating company of Mr.

Suthanthiran's business empire, yet rental payments totaling between $30,000 and $40,000 are

not actually being made.  An employee of Mr. Suthanthiran testified that the rental payments are

instead made via multiple intercompany book entries without any actual payment or

documentation.  *See* <u>Exhibit I</u>, Peverall Depo. Tr. 20:19-22, 21:1-9.  In addition, the Debtors'

management decided to suspend these intercompany transfers to prevent money from technically

being placed under the name of the Debtors and thus to hinder Wells' judgment collection

efforts.  *See* <u>Exhibit H</u>, Speranzo Depo. Tr. 16:1-3, 17:1-16.  Finally, the Debtors have failed to

enforce an important provision of the Fullerton Leases which requires that BMI provide

$900,000 in escrowed funds for decommissioning the properties with respect to the radioactive

materials located on site.  Although Mr. Suthanthiran pointed to the challenges of relocating

radioactive material when he unsuccessfully sued to enjoin Wells' foreclosure of the Fullerton

Properties, he failed to direct that BMI set aside funds for this purpose despite this lease

requirement.  This self-dealing, incestuous behavior on the part of the Debtors' management

demands the appointment of an independent trustee so as to enforce the leases and safeguard the

other assets of the bankruptcy estate on an arms-length basis.  The District Court implemented

this exact solution when it appointed a receiver for the Fullerton Properties, and the same issues

now require the appointment of a chapter 11 trustee.

58.    Publicly available tax records show that Gunston Hall has failed to timely pay

$123,688.86 in Maryland real estate taxes.  Additionally, four of the single-purpose Maryland

LLC's in which Gunston Hall has a 50% ownership interest are also delinquent in Maryland real

estate tax payments in excess of $90,000.  If these delinquent taxes are not paid by early May

2013, under local law the various properties would be sold at a tax sale shortly thereafter.  This

failure on the part of Mr. Suthanthiran and the Debtors to keep their tax obligations paid

exemplifies the gross mismanagement of the Debtors and seriously threatens Wells' collateral.[8]

59.    Finally, apart from their inability to properly oversee their general finances, the

Debtors have been grossly mismanaged with respect to the radioactive materials located on site

at the Fullerton Properties.  BMI possesses a license from the Virginia Department of Health

allowing it to possess radioactive materials, yet this license was exploited by Mr. Suthanthiran in

---

[8]    Failure to pay taxes is in fact cause for mandatory conversion or dismissal under 11
U.S.C. § 1112(b)(1) pursuant to subsection (b)(4)(I).  In its discretion, however, a court
may also appoint a trustee under § 1104(a) if doing so is in the best interests of the
creditors and the estate.

its recent effort to block Wells' foreclosure sale.  The offensive use of both the state license and

the radioactive materials in a purely commercial matter qualifies as gross mismanagement,

especially since the Debtors had failed on the same argument only two years prior.  The District

Court correctly recognized this gross mismanagement and appointed a receiver for the Fullerton

Properties to allow Wells to safely and properly conduct the foreclosure sale.[9]

60.     The Debtors' management and Mr. Suthanthiran have grossly mismanaged the

Debtor's assets and have seriously threatened the value of Wells' collateral.  The most effective

and cost-efficient manner of correcting this is the appointment of a Chapter 11 trustee.

**(iii)    Conflicts of interest both within the Debtors and with related Best Medical
entities are cause under § 1104(a)(1).**

61.     Cause for the appointment of a trustee also exists where the continuation of

management as the debtor in possession results in conflicts of interest with related corporations.

*See West Oaks Mall*, 2007 Bankr. LEXIS 3737 at *10-11.  "Debtors in possession are fiduciaries

of the estate and . . . [a] trustee should be appointed when the debtor in possession cannot

perform its fiduciary duties."  *Id.* at *11-12.  These fiduciary obligations are threatened when the

debtor's equity-holders also own interests in creditors of the debtor, particularly if those

creditor's claims are significant.  As one bankruptcy court commented in this type of situation:

---

[9]     The receiver was appointed by the District Court on April 5, 2013.  Later that day, the
Debtors filed their Chapter 11 petitions.  The receiver therefore was entitled to take
control of the Fullerton properties prior to the Debtors' bankruptcies, and as such has
both rights and obligations under 11 U.S.C. § 543.  However, the Debtors are not
complying with the District Court order and the receiver is unable to perform his required
duties under § 543(b).  This is further evidence of the Debtors' general non-compliance
with their own legal duties, and serves as cause for the appointment of a trustee under
§ 1104(a).  In addition, Wells requests alternative relief under 11 U.S.C. § 543(d)(1),
which permits a previously appointed receiver to retain possession and control of estate
property if it is in the best interests of creditors and equity security holders if the debtor is
not insolvent.  As discussed herein, Wells is apparently the sole creditor in these cases
and asserts that oversight of the Fullerton Properties by the previously appointed receiver
is in its best interest.

"The magnitude of the number of inter-company transactions places current management . . . in a position of having grave potential conflicts of interest and the presumption arises that the current management . . . will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims . . . ."

*In re L. S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980).

62.     This Court has recognized the importance of appointing a trustee to resolve a debtor in possession's conflicts of interest in *In re Funge Systems, Inc.*, 2002 Bankr. LEXIS 1937 (Bankr. E.D. Va. Oct. 17, 2002).  The focus should be on any inability of the debtor's management to fulfill its fiduciary duties, and any "uneven insider transactions or self-dealing clearly may be deemed a breach of fiduciary duty." *Id.* at *18.  The Court noted that a conflict of interest has alone been held to be a sufficient justification for a trustee.  *Id.* at *17 (citing *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3rd Cir. 1998)).

63.     With the Debtors now in bankruptcy, the interlocked structure of Mr. Suthanthiran's Best Medical companies produces a number of disqualifying conflict of interests.  First and foremost is the clear fact that Mr. Suthanthiran is the sole shareholder and President of both the Debtors and many related Best Medical entities which have claims against the Debtors.  He is also a guarantor and judgment debtor on Wells' indebtedness.  The intercompany transfers have generated a number of intercompany claims which need to be reconciled and investigated in the Debtors' bankruptcy cases. *See* Exhibit C,  Hr'g Tr., *Best Medical International, Inc., et al, v. Wells Fargo*, 15:15-16 (Nov. 9, 2012).  Second, there are the Debtors' actions for recovery against certain of these related entities, including the Debtors' claim for past due rent from BMI.  Apart from the tremendous task of untangling these companies' finances to determine who owes what to whom, Mr. Suthanthiran and the Debtors' management are placed in the impossible position of representing the Debtor, the Debtors'

creditors, Mr. Suthanthiran and the Debtors' debtors.[10]  Third, Mr. Suthanthiran is both the

property owner of the Fullerton Properties through his ownership of the Debtors, and is also the

tenant through his ownership of BMI.  The District Court appointed a receiver to place a neutral

third party in control of the Fullerton Properties because Mr. Suthanthiran could not maintain

proper business judgment amongst this dizzying array of conflicts.  Placing the Debtors into

bankruptcy only heightens the need for unbiased management because Mr. Suthanthiran and the

Debtors' management are simply unable to perform their fiduciary duties under the Bankruptcy

Code given these conflicts of interest.  Moreover, their actions in grossly mismanaging the

Debtors often involved uneven insider transactions and blatant self-dealing, including their

attempt to fraudulently transfer $1.5 million and their abuse of multiple bank accounts to shift

money to improperly thwart Wells' collection efforts.  A trustee is absolutely necessary under §

1104(a)(1) to avoid these conflicts and ensure fair treatment of all of the Debtors' creditors, not

just those owned by Mr. Suthanthiran.

**(B)** **The appointment of a Chapter 11 trustee is in the best interests of the
creditors under 11 U.S.C. § 1104(a)(2).**

64.     The appointment of a trustee under § 1104(a)(2) is also warranted.  This

subsection directs the Court to look to "the interests of creditors, any equity security holders, and

other interests of the estate . . . ."  11 U.S.C. § 1104(a)(2).  The standard for a trustee under

§ 1104(a)(2) "is more flexible than those under § 1104(a)(1) and the determination lies within

the sound discretion of the bankruptcy court."  *West Oaks Mall, LP*, 2007 Bankr. LEXIS 3737 at

*14.  Among the factors considered for the appointment of a trustee under § 1104(a)(2) are the

following:

---

[10]     This problematic situation may even affect the Debtors themselves, as one or both may
be creditors of the other.

(1) the trustworthiness of the debtor;
(2) the debtor in possession's past and present performance and prospects for the
debtor's rehabilitation;
(3) the confidence—or lack thereof—of the business community and of creditors
in present management, and
(4) the benefits derived by the appointment of a trustee, balanced against the cost
of the appointment.

*In re Ionosphere Club, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).  This is a separate legal

inquiry than subsection (a)(1), as it "allows the appointment of a trustee even when no 'cause'

exists."  *Id.*  The analysis under subsection (a)(2) instead involves equitable considerations of the

interests of creditors and others involved in the estate, compelling a court to "look to the

practical realities and necessities inescapably involved in reconciling competing interests."  *In re*

*General Oil Distributors, Inc.*, 42 B.R. 402, 408 (Bankr. E.D.N.Y. 1984) (citing *Main Line*

*Motors*, 9 B.R. at 784).

65.     Wells appears to be the only significant creditor in these cases, and in any event

will be the largest creditor by far.  It is also the Debtors' sole secured creditor.  The remaining

creditors listed by the Debtors to date are *de minimis*.  This simplifies the analysis under §

1104(a)(2), as Wells' interest will be highly determinative in assessing the 'interests of creditors'

under that subsection.

    **(i)**    **The vehement hatred by Mr. Suthanthiran against Wells, and Wells' deep
and well-founded distrust of Mr. Suthanthiran, necessitates the appointment
of a trustee.**

66.     Strong friction between the debtor and its creditors has been a highly relevant

consideration under § 1104(a)(2).  "Where . . . no meaningful progress towards reorganization is

possible because of deep rooted animosities between a Debtor and major creditors, an

independent reorganization trustee may well be necessary to insulate the reorganization process

from paralytic conflict."  *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 527 fn.11 (Bankr.

E.D.N.Y. 1989).  Though debtors and creditors naturally will disagree over certain aspects of the

bankruptcy case, such disagreements can reach a point where the looming administrative costs

necessitate the involvement of a neutral third party.  *See In re The Bible Speaks*, 74 B.R. 511,

512 (Bankr. D. Mass. 1987) (appointing trustee under § 1104(a)(2) in part because conflict

between debtor and creditors "threatens to engulf this estate in costly and legalistic bickering

over the entire range of the reorganization process").

67.    For example, in *In re Celeritas Techs., LLC*, 446 B.R. 514 (Bankr. D. Kan. 2011),

the debtor resisted disclosing its basic corporate history to a secured creditor, forcing the secured

creditor to resort to costly discovery efforts.  The bankruptcy court appointed a trustee in part

because of the debtor's overly hostile approach towards working with its creditor.  The debtor's

intransigence in *Celeritas* required that the secured creditor enforce the debtor's fiduciary duties

at great expense to that creditor.  *Id.* at 520.  The court found that this belligerent stance required

the appointment of a trustee to ensure that the bankruptcy case could proceed.

68.    Mr. Suthanthiran and the Debtors' management have a long history of taking

overly aggressive positions against Wells.  They have challenged every collection action

commenced by Wells, filed multiple baseless lawsuits alleging implausible claims, and  have

generally pursued a 'scorched earth' policy against Wells.  The Debtors' recent failed attempt to

enjoin Wells' foreclosure activity exemplifies the Debtors' tactics.  Instead of properly notifying

the appropriate regulatory agency of the pending foreclosure sale and taking active steps to

relocate their operations, the Debtors instead filed a last-minute injunction action relying on the

radioactive materials located on site.  Like the Fairfax Circuit Court before it, the District Court

disregarded the Debtors' faulty arguments and instead appointed a receiver for the Fullerton

properties.  This scenario has played out repeatedly since the Best Medical borrowers defaulted

in 2009, in which Wells at great legal expense is required to seek enforcement of the Debtors'
contractual obligations.

69.     These improper and harassing tactics were also on display in Mr. Suthanthiran's
approach to the Debtor's Interrogatories, which are usually a short discovery exercise.  These
particular Debtor's Interrogatories lasted nearly one year due to the variety of delay obstruction
that the Debtors and Mr. Suthanthiran relied upon.  Mr. Suthanthiran first refused to appear, and
after being compelled to appear he deliberately evaded Wells' questions and feigned a lack of
any substantive knowledge.  *See* Exhibit A, Suthanthiran Depo. Tr. May 25, 2012.  The Fairfax
Circuit Court had to reset the depositions and resort to threats of incarceration if he again
attempted to evade truthfully answering Wells questions.  *See* Exhibit C, Hr'g Tr., *Best Medical
International, Inc., et al v. Wells Fargo*, 18:4-11 (June 22, 2012).

70.     Due to the Debtors' history of aggressively initiating frivolous litigation against
Wells – including against individual Wells' personnel – in connection with the defaulted loans, a
severely acrimonious relationship has developed between the Mr. Suthanthiran and Wells.  This
in turn has needlessly increased the administrative collection costs of this defaulted loan.  The
bankruptcy court in *Celeritas* recognized that a bankruptcy debtor's refusal to comply with its
basic disclosure duties signaled that the administrative costs of the bankruptcy case would soon
exceed reasonable limits and unfairly allocate costs towards the secured creditor.  *See Celeritas*,
446 B.R. at 520.  To prevent this from occurring in the Debtors' bankruptcy cases and depleting
the Debtors' assets, a trustee should be appointed.

**(ii)     The Debtors' conflicts of interest are a valid basis for a trustee under
§ 1104(a)(2).**

71.     A debtor's conflicts of interest can also cause a court to appoint a trustee under
§ 1104(a)(2).  In the case of *In re Ridgemour Meyer Props.*, LLC, 413 B.R. 101, 113-14 (Bankr.

S.D.N.Y. 2008), the president and principal of a debtor engaged in illicit property transfers, refused to abide by subsequent court proceedings, and paid himself extravagantly and improperly from the debtor's assets.  The bankruptcy court appointed a trustee, finding that "[a]n independent trustee should be appointed under § 1104(a)(2) when [the debtor and its managers] suffer from material conflicts of interest, and cannot be counted on to conduct independent investigations of questionable transactions in which they were involved."  *Id.* at 113.  Likewise, in the case of *In re Nautilus of New Mexico, Inc.*, 83 B.R. 784 (Bankr. D.N.M. 1988), the president and main equity holder was replaced by a trustee due to multiple conflicts of interest. The *Nautilus* court listed three principal reasons for its decision under § 1104(a)(2):  (1) his role as manager directly conflicted with his claim as a creditor since he would direct which creditors would be paid and when; (2) he was involved in potential preferential transfers which he himself would have to then investigate as manager; and (3) he had filed a motion against the debtor in his personal capacity.  *Id.* at 789.

72.     As discussed in Section (A)(iii) above, Mr. Suthanthiran, the sole shareholder and President, is undoubtedly conflicted with respect to the Debtors and all Best Medical companies, which are completely intertwined financially and for which he alone retains ultimate decision-making authority.  He is personally and deeply intertwined with Best Medical's collective accounting, as he lives entirely off of Best Medical bank accounts and has on several occasions "loaned" money to various Best Medical entities, which is purportedly set off against a salary that he does not actually receive.  There are also serious conflicts of interest in which Mr. Suthanthiran owns and controls entities which have claims against each other.  The overwhelming financial interrelationships between Mr. Suthanthiran, the Debtors, and all of the

Best Medical entities make it impossible for him to investigate improprieties and otherwise
effectively serve as a manager for the for the debtors-in-possession.

### (iii)   **The total lack of confidence by non-related creditors in current management supports the appointment of a trustee.**

73.     A creditor's lack of confidence in the debtor is another valid basis for the
appointment of a trustee under § 1104(a)(2).  *See In re Colorado-UTE Electric Ass'n*, 120 B.R.
164 (Bankr. D. Colo. 1990).  In that case, the bankruptcy court commented on the creditors'
sincere lack of confidence in the debtor to reorganize the business based on the debtor's prior
history of gross mismanagement.  *Id.* at 176.  A bankruptcy court is directed to look at the
interest of creditors under § 1104(a)(2), and these creditors' reasonable concerns about the ability
and competence of the debtor to effectively reorganize are proper considerations for the
appointment of a trustee.  In addition, the support of a major creditor has been held by a district
court to be a factor in the appointment of a trustee under § 1104(a)(2).  *See Tradex Corp. v.
Morse*, 39 B.R. 823, 835 (D.C. Mass. 2006).  The court observed that a large lawsuit between the
creditor and debtor as well as the "resulting tensions between the parties were considered
sufficiently factual by the court when evaluating the appropriateness of appointing a trustee."  *Id.*

74.     Wells has a total and utter lack of confidence or trust in Mr. Suthanthiran and the
Debtors' management with regard to their ability to either successfully reorganize the Debtors or
to respect their fiduciary duties.[11]  They simply are not trustworthy and have been willing to go
to any lengths to forestall Wells' collection of the amounts rightfully owed by the Best Medical
entities.  They have repeatedly shown an unwillingness to work reasonably with Wells in
resolving this dispute, preferring instead costly litigation which only further drives up the cost of

---

[11]     Upon information and belief, Gunston Hall has also lost the confidence of its main
business partner due to problems arising from financial mismanagement and a failure to
fully participate in the ongoing projects of the businesses.

this dispute.  Mr. Suthanthiran has not honored any agreement ever reached with Wells.  Given

the Debtors' acrimonious relationship with Wells as well as the many ways that Mr. Suthanthiran

has mismanaged the Debtors and its affiliates to date, Wells reasonably has serious concern

about the Debtors' capability to effectively reorganize without the appointment of an impartial

Chapter 11 trustee.  Consequently, Wells wholeheartedly supports the appointment of a trustee

notwithstanding any additional cost and expense associated therewith.

75.     To date, Wells is not aware of any other secured creditors of the Debtors' estates,

and will likely end up the only secured creditor in these cases, if not the only creditor, with its

collateral alone standing to lose value on account of Mr. Suthanthiran's continued

mismanagement.[12]  Consequently, its unequivocal support for a trustee should carry more

weight.  Moreover, the additional costs of a trustee will be drawn directly from Wells' collateral.

Wells believes that the additional costs of a trustee are easily outweighed by the administrative

and litigation costs which would ensue if current management is permitted to remain in control.

76.     For all of foregoing reasons, Wells submits that "cause" is easily established

under the facts and circumstances of the instant case pursuant to § 1104(a)(1).  Furthermore,

under § 1104(a)(2), it is in the best interest of the estate, Wells, and all parties-in-interest for a

Chapter 11 trustee to be appointed.  No harm will be affected by such an appointment.  Rather, it

preserves and enhances the value of the estate for all creditors and parties in interest.

Accordingly, for all of the foregoing reasons, Wells moves the Bankruptcy Court to appoint a

Chapter 11 trustee over the Debtors' estates.  An independent Chapter 11 trustee must be

appointed and put in place if Wells' collateral, the estate, and its creditors are to be protected.

---

[12]     As to the effect on Mr. Suthanthiran and the other Best Medical entities, it is important to note that the Debtors are merely real estate holding companies for investment purposes, and are not central to the medical operations of Mr. Suthanthiran's medical business.

**CONCLUSION**

WHEREFORE, Wells respectfully requests that this Court enter an order: (i) granting the

Motion; (ii) appointing a chapter 11 trustee in the Debtors' cases; and (iii) granting Wells such

other and further relief as is just and proper.


Dated: Alexandria, Virginia          Respectfully submitted,
April 11, 2013

                                     /s/ Douglas M. Foley
                                     Douglas M. Foley (VSB No. 34364)
                                     J. Robertson Clarke (VSB No. 81979)
                                     McGUIREWOODS LLP
                                     2001 K Street N.W., Suite 400
                                     Washington, DC 20006-1040
                                     Telephone: (202) 857-1700
                                     Facsimile: (202) 857-1737
                                     dfoley@mcguirewoods.com
                                     jclarke@mcguirewoods.com

                                     David I. Swan (VSB No. 75632)
                                     McGUIREWOODS LLP
                                     1750 Tysons Boulevard, Suite 1800
                                     Tysons Corner, VA 22102-4215
                                     Telephone: (703) 712-5000
                                     Facsimile: (703) 712-5050
                                     dswan@mcguirewoods.com

                                     *Counsel for Wells Fargo Bank, N.A.*

47125465_7.DOCX